**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| BankFirst, a South Dakota state bank, | Civil No. 08-5897 (DWF/FLN) |
| Plaintiff, | |
| v. | **MEMORANDUM**<br>**OPINION AND ORDER** |
| Alan H. Ginsburg, an individual; Frank Shunock, an individual; BEH Gaming, Ltd., a limited partnership; Warm Wind Trust; and Warm Winds Partners, Ltd., a limited partnership, | |
| Defendants. | |

---

Jerome A. Miranowski, Esq., and S. Renee Dotson, Esq., Faegre & Benson LLP, counsel for Plaintiff.

Jason A. Lien, Esq., Keiko L. Sugisaka, Esq., and Richard G. Wilson, Esq., Maslon Edelman Borman & Brand, LLP, counsel for Defendants.

---

**INTRODUCTION**

This matter is before the Court on a Motion to Dismiss or Alternatively to Transfer Venue brought by BEH Gaming, Ltd. ("BEH Gaming"); a Motion to Dismiss or Alternatively to Transfer Venue brought Warm Wind Trust ("WWT") and Warm Winds Partners, Ltd. ("WWP") (together with BEH Gaming, the "BEH Entities"); and Motions to Transfer Venue brought by defendants Alan H. Ginsburg and Frank Shunock.  For the reasons stated below, the Court denies all motions.

## BACKGROUND

Bank First is a South Dakota state bank, with its largest office located in Minneapolis, Minnesota, and a holding company, Marshall BankFirst, located in Minnesota.  BEH Gaming is a limited partnership organized under the laws of the state of Florida.  (Decl. of Joseph Shunock  ("Shunock Decl.") ¶ 2.)  BEH Gaming was formed for the purpose of developing an Indian gaming facility called the Northern Winz Casino (the "Casino Project") for the Chippewa Cree Tribe of the Rocky Boy's Reservation, a federally recognized Indian Tribe, located in Box Elder, Montana.  (Decl. of Gene Harris ("Harris Decl.") ¶ 2.)  Defendants Alan Ginsburg and Frank Shunock are the principals of BEH Gaming.  (*Id.*)  Ginsburg is a resident of Florida and Shunock is a citizen of Canada and a resident of Florida.  WWP is a limited partnership organized under the laws of the state of Florida and a partner of BEH Gaming.  (Shunock Decl. ¶ 2.)  Ginsburg and Shunock hold interests in BEH Gaming through certain entities, including WWP.  (Harris Decl. ¶ 2.)  WWT is a trust formed under the laws of Canada.  Shunock is a beneficiary of WWT.

BEH Gaming agreed to assist the Chippewa Cree Community Development Corporation ("CCCDC") obtain construction financing for the Casino Project.  (Shunock Decl. ¶ 2.)  In August 2005, BEH Gaming and CCCDC entered into a Turn-Key Facility Agreement (the "Development Agreement"), under which BEH Gaming warranted and represented that it would provide, or arrange for a third party to provide, financing to the CCCDC for the construction of the Casino Project.  (Decl. of Keiko L. Sugisaka

("Sugisaka Decl.") ¶ 14, Ex. K at § 3.3.) Prior to signing the Development Agreement with the CCCDC, BEH Gaming hired a hospitality consulting firm located in Minneapolis, Minnesota, to conduct a feasibility study for the Casino Project. BEH Gaming provided this study to BankFirst in Minneapolis. (Aff. of Steven W. Erickson ("Erickson Aff.") ¶ 3.)

BEH Gaming sought financing from BankFirst and engaged in discussions regarding financing for the Casino Project, primarily with John Jagiela and Steven Erickson of BankFirst. (Erickson Aff. ¶ 2; Harris Decl. ¶ 3; Decl. of Ray Brown ("Brown Decl.") ¶ 2.) During negotiations between BankFirst and BEH Gaming, Jagiela flew to Montana to meet with representatives of BEH Gaming to inspect the proposed site, visit with Tribal officials, and to discuss the feasibility study. (Decl. of John Gruttadaurio ("Gruttadaurio Decl.") ¶ 3.) Jagiela also visited Montana in September 2006 to review the Casino Project's status and to assemble the outstanding loan package. (Brown Decl. ¶ 3.)

Representatives of BEH Gaming had contacts with BankFirst in Minneapolis. Specifically, in 2005 and 2006, BEH Gaming representative Gene Harris communicated with BankFirst representatives via telephone, e-mail, and written correspondence in an effort to obtain financing for the Casino Project. (Harris Decl. ¶ 4.) These communications continued through 2007, during and after the construction phase of the Casino Project. (*Id.*) Ray Brown, an Indian gaming consultant acting on behalf of BEH Gaming, also participated in discussions with Jagiela in 2005 and 2006; these

communications were related to efforts to obtain construction financing and occurred mainly over the telephone, via e-mail, or by written correspondence. (Brown Decl. ¶ 2.) Brown continued to have communications with Erickson and Jagiela through 2008. (*Id.*) In 2006 and 2007, John Gruttadaurio, counsel for Ginsburg, Shunock, BEH Gaming, WWT, and WWP, had contacts with BankFirst in Minneapolis via telephone, e-mail, and written correspondence. (Erickson Aff. ¶ 2-3; Gruttadaurio Decl. ¶ 2.) Gruttadaurio also traveled to Minneapolis on two occasions. On or around June 1, 2006, Gruttadaurio visited Minneapolis to review and discuss loan documents with representatives of Marshall BankFirst, BankFirst, and the CCCDC. (Gruttadaurio Decl. ¶ 4.) Gruttadaurio visited BankFirst in Minneapolis again in March 2007, during which he discussed the obligations arising under the WWT and WWP Guaranty Agreements and the documents that BEH Gaming, WWP, and WWT were required to provide to BankFirst during the term of the loan. (Aff. of Mary Jo Brenden ("Brenden Aff.") ¶ 3.) In addition, G. Joseph Shunock, a BEH Gaming representative and the sole member of WWP, communicated with BankFirst in Minneapolis via telephone, e-mail, and written correspondence regarding financing for the Casino Project. (Erickson Aff. ¶ 5.)

On August 1, 2006, the CCCDC and BankFirst entered into a Loan Agreement. (Decl. of Keiko L. Sugisaka ("Sugisaka Decl.") ¶ 3, Ex. A.) BankFirst's Minneapolis office originated and administered the loan to CCCDC. (Erickson ¶ 11; Supp. Aff. of Steven W. Erickson ¶ 2.) Each of the defendants executed Guaranty Agreements whereby each guaranteed the timely payment in full and performance of all amounts due

under the loan documents, plus accrued interest and other fees. (Sugisaka Decl. ¶¶ 5-9, Exs. C-G.) Ginsburg signed his Guaranty Agreement in Florida. (Gruttadaurio Decl. ¶ 6.) The Shunock, BEH Gaming, WWT, and WWP Guaranty Agreements were all signed in Canada. (Shunock Decl. ¶ 6; Decl. of John Burchynsky ("Burchynsky Decl.") ¶ 4.) The Guaranty Agreement executed by Ginsburg and Shunock included provisions indicating that they consented to personal jurisdiction in Minnesota. (Sugisaka Decl. ¶¶ 5-6, Ex. C-D at § 5.14.) All five of the Guaranty Agreements contain a Minnesota choice of law provision and require that all written notices and annual and quarterly financial statements or audits be sent to BankFirst in Minneapolis, Minnesota. In addition, the Guaranty Agreements also state that the obligations of the guarantors are joint and several and independent of those of all other guarantors and the borrower.

BankFirst closed on the loan on or about November 15, 2006, in Box Elder, Montana. (Harris Decl. ¶ 9.) On or around February 21, 2008, BankFirst gave the CCCDC and the defendant guarantors written notice that the CCCDC had breached the Loan Agreement.[1] (Erickson Aff. ¶ 8.) Beginning in March 2008, the guarantors made payments due on the loan directly to BankFirst in Minneapolis. (*Id*. ¶ 9.) BankFirst and the guarantors then engaged in discussions regarding possible modifications to the loan

---

[1] The parties vigorously dispute the facts leading up to the default. BankFirst asserts that it agreed to provide financing after certain conditions precedent were satisfied and that delays in financing occurred due to delays in satisfying those conditions. Defendants assert that BankFirst breached promises and made misrepresentations regarding the timing of BankFirst's financing that caused construction delays and contributed to the
(Footnote Continued on Next Page)

documents, including a potential forbearance plan. (*Id.* ¶ 10.) In June 2008, Harris traveled to Minneapolis on behalf of BEH Gaming to discuss a forbearance agreement. (*Id.*; Harris Decl. ¶ 5.) These discussions ultimately failed and BankFirst accelerated the loan and demanded payment. The guarantors failed to pay the accelerated balance. (Erickson Aff. ¶ 10.)

On October 9, 2008, BankFirst brought this action against the Defendants as guarantors of the construction financing loan after the borrower, the CCCDC, defaulted on the loan. BankFirst originally brought the action in Hennepin County District Court and Defendants removed the action to this Court. After removal, Ginsburg and Shunock filed answers and counterclaims alleging fraud, breach of contract, breach of implied covenant of good faith and fair dealing, and promissory and equitable estoppel. Ginsburg and Shunock seek to extinguish their Guaranty Agreements and to recover damages for BankFirst's alleged misrepresentations. The BEH Entities moved to dismiss for lack of personal jurisdiction. All defendants move to transfer venue to the District of Montana.

---

(Footnote Continued From Previous Page)
failure of the Casino Project and the subsequent default.

**I.     Motion to Dismiss for Lack of Jurisdiction**

   **A.     Standard for Establishing Personal Jurisdiction**

When a defendant challenges personal jurisdiction, the plaintiff has the burden to show that personal jurisdiction exists. *Burlington Indus., Inc. v. Maples Indus., Inc.,* 97 F.3d 1100, 1102 (8th Cir. 1996) (citing *Gould v. P.T. Krakatau Steel,* 957 F.2d 573, 575 (8th Cir. 1992)). To survive a motion to dismiss for lack of personal jurisdiction, however, the plaintiff need only make a prima facie showing of personal jurisdiction over the defendant. *Digi-Tel Holdings, Inc. v. Proteq Telecomms. (PTE), Ltd.,* 89 F.3d 519, 522 (8th Cir. 1996) (citing *Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A.,* 51 F.3d 1383, 1387 (8th Cir. 1995)).

When considering whether personal jurisdiction exists, the court may consider matters outside the pleadings; "the court may inquire, by affidavits or otherwise, into the facts as they exist." *Stevens v. Redwing,* 146 F.3d 538, 543 (8th Cir. 1998) (quoting *Land v. Dollar,* 330 U.S. 731, 735 n. 4 (1947)). For the purposes of determining whether the plaintiff has made a prima facie showing of personal jurisdiction, the court must view the evidence in the light most favorable to the plaintiff and resolve all factual conflicts in the plaintiff's favor. *Digi-Tel,* 89 F.3d at 522 (citing *Dakota Indus., Inc. v. Dakota Sportswear, Inc.,* 946 F.2d 1384, 1387 (8th Cir. 1991)). Each defendant's contacts with the forum state must be assessed individually. *See, e.g., Minn. Mining & Mfg. Co. v. Rauh Rubber, Inc.*, 943 F. Supp. 1117, 1122 (D. Minn. 1996).

In determining whether a court has personal jurisdiction over a non-resident

defendant, a court must ordinarily satisfy both the requirements of the state long-arm statute and of federal due process. *Id.* (citing *Northrup King,* 51 F.3d at 1387). The Minnesota long-arm statute extends jurisdiction to the maximum limit consistent with due process, and therefore a court in Minnesota need only evaluate whether the requirements of due process are satisfied. *Wessels, Arnold & Henderson v. Nat'l Med. Waste, Inc.,* 65 F.3d 1427, 1431 (8th Cir. 1995).

Federal due process requires that a defendant have "certain minimum contacts" with the forum state such that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Wash.,* 326 U.S. 310, 316 (1945) (internal quotations omitted). The defendant's conduct and connection with the forum state must be such that the defendant should reasonably anticipate being haled into court there. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980). It is essential in each case that the defendant has purposefully availed itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253 (1958)).

A court may use one of two different analyses to determine whether a defendant's contacts with the forum state establish personal jurisdiction. *Epps v. Stewart Info. Servs. Corp.,* 327 F. 3d 642, 648 (8th Cir. 2003). In a general jurisdiction case, a defendant maintains such "continuous and systematic" contacts with a state that it becomes subject to the jurisdiction of that state's courts for any purpose. *Morris v. Barkbuster, Inc.,* 923

F.2d 1277, 1281 (8th Cir. 1991) (quoting *Helicopteros Nacionales de Columbia v. Hall,* 466 U.S. 408, 414 n. 9, 416, 418-19 (1984)). Specific jurisdiction, on the other hand, requires that the defendant has "purposely directed" its activities at residents of the forum and that the litigation results from alleged injuries that "arise out of or relate to" those activities. *Wessels,* 65 F.3d at 1432 (quoting *Burger King,* 471 U.S. at 472).

Regardless of which analysis is used, the Eighth Circuit applies a five-factor test in determining whether the exercise of personal jurisdiction would pass constitutional muster: (1) the nature and quality of defendant's contacts with the forum state; (2) the quantity of contacts; (3) the source and connection of the cause of action with those contacts; and, to a lesser degree, (4) the interest of the forum state; and (5) the convenience of the parties. *Wessels,* 65 F.3d at 1432. The first three factors are of primary importance, while the last two are "secondary factors." *Minn. Mining & Mfg. Co. v. Nippon Carbide Indus. Co.,* 63 F.3d 694, 697 (8th Cir. 1995). The third factor distinguishes between specific and general jurisdiction. *Digi-Tel,* 89 F.3d at 523 n.4 (citing *Wessels,* 65 F.3d at 1432 n.4).

### B. Personal Jurisdiction over the BEH Entities

The parties agree that the inquiry in this case is whether specific jurisdiction exists. The BEH Entities argue that this Court lacks specific jurisdiction over them. The BEH Entities point out that none of the entities are registered to do business in Minnesota and do not conduct business in Minnesota; that none of the entities have assets, property, records, employees, or offices in Minnesota; and that the relevant Guaranty Agreements

were executed in Canada.  Further, the BEH Entities assert that their contacts with Minnesota, taken individually, are insufficient to establish personal jurisdiction.  The BEH Entities maintain that nearly all of the operative facts underlying this dispute occurred outside of Minnesota.  For example, the BEH Entities assert that the parties' due diligence for the Casino Project, many of the negotiations over the financing and guarantees, the actual execution of the guarantees, and the underlying causes for the alleged breach of the guarantees all occurred outside of Minnesota.  The BEH Entities further assert that this litigation did not arise out the BEH Entities' contacts with Minnesota.  The BEH Entities also argue that the choice of law clauses in the guarantees cannot alone support personal jurisdiction and the lack of minimum contacts outweighs any interest that the state of Minnesota may have in providing a forum for this dispute.

The Court disagrees and concludes that it has specific personal jurisdiction over each of the BEH Entities.  None of the BEH Entities have operations in Minnesota, but each of their contacts with Minnesota are sufficient for the Court to exercise personal jurisdiction over them.  BEH Gaming sought over $12 million in financing from BankFirst in Minneapolis, Minnesota.  Each of the BEH Entities had contacts with BankFirst's Minneapolis office.  For example, representatives for the BEH Entities made phone calls and sent e-mails and written correspondence to BankFirst in Minnesota on numerous occasions.  (Brown Decl. ¶ 2; Erickson Aff. ¶¶ 2, 4, 5, 9, 10; Brenden Aff. ¶ 3; Harris Decl. ¶¶ 3, 4, 5; Gruttadaurio Decl. ¶¶ 2, 3, 4.)

In addition, representatives of the BEH Entities visited BankFirst in Minnesota

regarding the Casino Project.  (Brenden Aff. ¶ 3; Gruttadaurio Decl. ¶ 4; Harris Decl. ¶ 5; Erickson Aff. ¶ 10.)  Gruttadaurio, an attorney for all of the guarantors, including each of the BEH Entities, visited Minneapolis on or around June 1, 2006 to discuss financing of the Casino Project. The BEH Entities argue that Gruttadaurio's June 2006 visit was not related to WWT's and WWP's guaranty agreements because the only agreements drafted at that time were for Ginsburg, Shunock, and BEH Gaming.  In addition, the BEH Entities claim that Gruttadaurio did not yet represent WWT or WWP "with respect to their guarantees."  (Gruttadaurio Decl. ¶ 4.)  The record before the Court establishes that BEH Gaming and its principals, Ginsburg and Shunock, sought financing with BankFirst; that BankFirst initially required guarantees from Ginsburg, Shunock, and BEH Gaming; and that after learning that a significant portion of Shunock's assets were held by WWT and WWP, that BankFirst also required guarantees from WWP and WWT.  (Erickson Aff. ¶ 6.)  The record also shows that BankFirst requested that WWT and WWP sign guarantees on June 7, 2006, just days after Gruttadaurio's June 2006 visit.  (*Id*. at 5.)  Gruttadaurio asserts that he was engaged by WWT and WWP "in connection with their guarantees" when this request was made.  (*Id*.)  Viewing the facts in the light most favorable to BankFirst, the Court determines that BankFirst has made a prima facie showing that Gruttadaurio's visit was related to the same overall financing deal that included all of the BEH Entities, including WWT and WWP; and that Gruttadaurio represented all of the BEH Entities.  Therefore, the Court considers this trip to constitute a contact made on behalf of each of the BEH Entities.

11

In 2007, Gruttadaurio visited Minneapolis again and during the visit discussed his clients' obligations under the WWT and WWP guaranty agreements, as well as documents that Ginsburg and the BEH Entities were required to provide BankFirst during the term of the loan. (Gruttadaurio Decl. ¶ 4; Brenden Aff. ¶ 3.) The BEH Entities assert that Gruttadaurio was visiting on an unrelated matter and did not have a substantive discussion about the guaranty agreements. However, the record before the Court contains evidence contradicting this assertion. Therefore, viewing the facts in the light most favorable to BankFirst, the Court also considers this a contact made on behalf of each of the BEH Entities, including WWT and WWP. Finally, Harris, a representative of BEH Gaming, visited BankFirst in June 2008 to discuss the modification of payment terms under the Loan Agreement.[2] (Harris Decl. ¶ 5.)

The BEH Entities also had contacts with Minnesota through their performance under their respective Guaranty Agreements. For example, all of the Guaranty Agreements required the guarantors, including the BEH Entities, to send annual audits, financial statements, and notices to BankFirst in Minneapolis. (*See, e.g.*, Sugisaka Decl. ¶¶ 7, 8, 9, Exs. E, F, G, at §§ 11(c)(i)-(ii), 16.) Further, the BEH Entities communicated with BankFirst in Minnesota regarding the default under the Loan Agreement and the

---

[2]   The BEH Entities assert that because the June 2008 visit occurred after BankFirst gave its written notice of default to the guarantors, it could not have given rise to BankFirst's cause of action. Regardless, the Court considers it as just one of several contacts when determining whether to exercise personal jurisdiction over BEH Gaming.

guarantors (including the BEH Entities) made payments directly to BankFirst in Minneapolis. (Erickson Decl. ¶¶ 8-10.) Ginsburg and Shunock, the principals of BEH Gaming, explicitly consented to jurisdiction in Minnesota.

The BEH Entities also agreed to a choice of law provision specifying the application of Minnesota law. Each of the Guaranty Agreements include a provision stating that they "shall be construed in accordance with and governed by the laws of the State of Minnesota." (Sugisaka Decl. ¶¶ 7, 8, 9, Exs. E, F, G at § 13.) While a choice of law provision, standing alone, is insufficient to create personal jurisdiction, it is a relevant consideration in determining whether a defendant has purposefully invoked the benefits and protections of a State's law. *Wessels,* 65 F.3d at 1434.

Based on the nature, quality, and quantity of each of the BEH Entities' contacts with Minnesota, the Court concludes that each of the BEH Entities could reasonably anticipate being haled into court in Minnesota in connection with the Guaranty Agreements that they executed in order to receive financing from BankFirst.

The Court also considers the source and connection of the cause of action with those contacts. Here, the connection is significant as BankFirst's claims are directly related to the BEH Entities' contacts with Minnesota. In particular, BEH Gaming sought financing from BankFirst, the BEH Entities had several contacts with BankFirst in Minnesota regarding the financing, visited Minnesota to discuss issues related to the financing, and secured financing with BankFirst by executing the Guaranty Agreements with Minnesota choice of law provisions. In addition, when the CCCDC ultimately failed

to make timely payments, the BEH Entities received BankFirst's default notices and subsequently tried to negotiate forbearance with BankFirst in Minneapolis. The Court concludes that the connection of the cause of action with the BEH Entities' contacts with Minnesota supports jurisdiction.

The final two factors, which are accorded less weight in the Court's analysis, also support jurisdiction. The BEH Entities have allegedly failed to pay the balance of a loan that they guaranteed, which in turn has deprived BankFirst, which has an office in Minnesota, of money it claims it is owed. Minnesota has an obvious interest in providing a forum in which BankFirst may litigate its claims. *See Northrup*, 51 F.3d at 1388-89. In addition, the convenience of the parties favors jurisdiction. A plaintiff is normally afforded its selected forum. As discussed below, some witnesses and evidence are located in Minnesota; other witnesses and evidence are located outside of Minnesota. Any inconvenience to defendants in litigating in Minnesota would be similarly experienced by BankFirst if required to litigate elsewhere.

The BEH Entities assert that, considered separately, none of the BEH Entities have sufficient contacts with Minnesota and that the fact that the BEH Entities guaranteed an obligation to a resident of Minnesota does not subject them to personal jurisdiction. The Court recognizes that the Eighth Circuit has held that nonresident guarantors of a contractual obligation have had insufficient contact with a forum-state to confer jurisdiction. *See Arkansas Rice Growers Coop. Ass'n v. Alchemy Indus., Inc.*, 797 F.2d 565 (8th Cir. 1986); *see also Arkansas Poultry Coop. Inc. v. Red Barn Sys.*, 468 F.2d 538

(8th Cir. 1972). In *Arkansas Rice Growers*, the Eighth Circuit explained that the mere fact that a defendant guarantees an obligation to a resident corporation does not subject the guarantors to jurisdiction in that resident corporation's state. *Id*. at 573. In so holding, the Eighth Circuit, however, distinguished cases where courts had exercised personal jurisdiction over nonresident guarantors. *Id*. In the distinguished cases, there was "substantive identity of the guarantors and the corporation whose obligation they guaranteed," "evidence that the beneficiary of the guarantee contract would not have entered into the transaction with the guarantees of specific individuals," or "a provision in the guarantee contract or the underlying contract stating that the law of the forum state would control." *Id*. at 573-74. Here, each of the BEH Entities had other contacts with Minnesota beyond simply guaranteeing an obligation to a Minnesota corporation. First, as discussed above, each of the BEH Entities had contacts with BankFirst's Minneapolis office. Second, performance under the Guaranty Agreements required continued contact with BankFirst in Minnesota. Finally, each of the BEH Entities signed agreements containing a Minnesota choice of law provision.

Based on the foregoing, the Court concludes that the BEH Entities purposefully directed their activities toward Minnesota and could reasonably expect that a dispute over their obligations under the Guaranty Agreements could be litigated in Minnesota. BankFirst has made a sufficient prima facie showing of personal jurisdiction and the Court is satisfied that it can exercise personal jurisdiction over each of the BEH Entities. The Court recognizes that the BEH Entities' contacts with Minnesota may not rise very

far above the minimum contacts necessary to establish jurisdiction. The Court's task, however, is not to determine the "best" forum for a suit, but to determine whether sufficient minimum contacts exist so that a suit against each of the BEH Entities in Minnesota does not offend traditional notions of fair play and substantial justice. Such contacts exist here. Therefore, the Court denies the BEH Entities' motions to dismiss.

## II. Motion to Transfer

All Defendants move to transfer this action to the District of Montana pursuant to 28 U.S.C. § 1404(a). That section provides: "For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). When deciding a motion to transfer pursuant to § 1404(a), the Court must consider the convenience of the parties, the convenience of the witnesses, and the interest of justice. *See Terra Int'l, Inc. v. Miss. Chem. Corp.*, 119 F.3d 688, 691 (8th Cir. 1997). In considering these factors, the Court must make a "case-by-case evaluation of the particular circumstances at hand and a consideration of all relevant factors." *Id.* The burden is on the party seeking the transfer "to show that the balance of factors 'strongly' favors the movant." *Graff v. Qwest Commc'ns Corp.*, 33 F. Supp. 2d 1117, 1121 (D. Minn. 1999). Here, there is no dispute that this case "might have been brought" in Montana. The Court therefore considers the relevant transfer factors.

### A. Convenience of the Parties

"[S]ection 1404(a) provides for transfer to a more convenient forum, not to a

forum likely to prove equally convenient or inconvenient, and a transfer should not be granted if the effect is simply to shift the inconvenience to the party resisting the transfer." *Id*. Normally, there is a presumption in favor of the plaintiff's forum. *Id.* Defendants assert that Montana would be a more convenient forum because the operative events leading to this action center in Montana. In particular, Defendants assert that the Guaranty Agreements cover a loan agreement that was entered into to develop the Casino Project in Montana; BankFirst made trips to Montana; the closing of the loan occurred in Montana; and the construction problems occurred in Montana.

Here, BankFirst chose Minnesota as its forum and events giving rise to this litigation occurred, at least in part, in Minnesota. BankFirst's Minneapolis office originated and administered the defaulted loan that the Defendants guaranteed. (Erickson Aff. ¶ 11.) The individual guarantors, Shunock and Ginsburg, consented to jurisdiction in Minnesota. Ginsburg and Shunock are the principals of BEH Gaming, which in turn is a partner of WWP. None of the individual guarantors, nor any of the representatives of the BEH Entities, reside in Montana. Thus, at most, Minnesota and Montana would be equally inconvenient for the Defendants. The Court finds that the convenience of the parties does not weigh in favor of transferring this case to the District of Montana.

### B. Convenience of Witnesses

The convenience of witnesses is an important factor for the Court and the parties because it affects the access to sources of proof. *Graff*, 33 F. Supp. 2d at 1121. In considering the convenience of witnesses, courts have focused on the number of

non-party witnesses, the location of all witnesses, and the preference of courts for live testimony as opposed to depositions. *See id*. Defendants argue that they will seek to add CCCDC to this action, and that many of the witnesses and evidence central to their defenses and counterclaims are located in Montana. BankFirst asserts that it will call its current and former employees, including five Minnesota residents, and perhaps other witnesses, none of whom reside in Montana, depending on the status of Defendants' counterclaim. There is no question that at least some of the fact witnesses reside in Minnesota and some in Montana. The Court concludes that the convenience of the witnesses does not weigh in favor of transferring this action to the District of Montana.

### C. Interests of Justice

The Court must also evaluate what venue will best promote the interests of justice. *Id*. This factor is weighed "very heavily." *Id.* A number of relevant considerations include judicial economy, the plaintiff's choice of forum, the costs of litigating in each forum, obstacles to a fair trial, choice of law issues, and the advantages of having a local court determine questions of local law. *See Terra Int'l*, 199 F.3d at 696. The Court recognizes the interest in protecting the plaintiff's choice of forum. In addition, each of the Guaranty Agreements contains a choice of law provision requiring the application of Minnesota law. Minnesota has an interest in providing a forum for BankFirst and this Court would have the advantage of being familiar with Minnesota law. Finally, the Court notes that both Ginsburg and Shunock consented to jurisdiction. Ginsburg and Shunock are also the principals, owners, and/or beneficiaries of the BEH Entities. Maintaining the

action here would promote the interests of justice and the Court finds that this factor does not weigh in favor of transferring this action to the District of Montana.

## CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons set forth above, **IT IS ORDERED** that:

1. The Motion of Defendant Frank Shunock to Transfer Venue (Doc. No. 18) is **DENIED**.

2. The Motion of Defendants Warm Wind Trust and Warm Winds Partners, Ltd. To Dismiss or Alternatively to Transfer Venue (Doc. No. 10) is **DENIED**.

3. The Motion of Defendant BEH Gaming, Ltd. to Dismiss or Alternatively to Transfer Venue (Doc. No. 6) is **DENIED**.

4. The Motion of Defendant Alan H. Ginsburg to Transfer Venue (Doc. No. 4) is **DENIED**.

Dated:  February 24, 2009                    s/Donovan W. Frank
                                             DONOVAN W. FRANK
                                             Judge of United States District Court