# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Outsource Services Management, LLC,
d/b/a Presidium Asset Solutions,

        Civil No. 08-5897 (DWF/FLN)

        Plaintiff,

v.

**MEMORANDUM
OPINION AND ORDER**

Alan H. Ginsburg, an individual; Frank Shunock,
an individual; BEH Gaming, Ltd., a limited
partnership; Warm Wind Trust; and Warm Winds
Partners, Ltd., a limited partnership,

        Defendants and
        Counterclaim Plaintiffs,

v.

Federal Deposit Insurance Corporation,
also known as BankFirst,

        Counterclaim Defendant.

---

Jerome A. Miranowski, Esq., Michael M. Krauss, Esq., and S. Renee Dotson, Esq.,
Faegre & Benson LLP, counsel for Plaintiff.

Jason R. Asmus, Esq., Richard G. Mark, Esq., and Tara Reese Duginske, Esq., Briggs &
Morgan, PA, counsel for Defendants and Counterclaim Plaintiffs.

Andrew J. Budish, Esq., Brian F. Leonard, Esq., and Jennifer K. Eggers, Esq., Leonard,
O'Brien, Spencer, Gale & Sayre, Ltd., counsel for Counterclaim Defendant.

---

**INTRODUCTION**

This matter is before the Court on a Motion for Summary Judgment on Affirmative Claims brought by Plaintiff Outsource Services Management, LLC d/b/a Presidium Asset Solutions ("OSM") and a Motion for Summary Judgment on Counterclaims brought by Counterclaim Defendant Federal Deposit Insurance Corporation (the "FDIC"). For the reasons stated below, the Court grants both motions.

**BACKGROUND**

OSM is the current lead lender and servicer on the loan at issue in this case (the "Loan"). The original lead lender was BankFirst, a South Dakota state bank. BankFirst went into FDIC receivership in July 2009. The FDIC succeeded to all of the right, title, and interest in the assets of BankFirst. The FDIC was substituted as plaintiff and counterclaim-defendant in this action. (Doc. No. 70.) In February 2010, OSM replaced the FDIC as lender and servicer of the loan, and the FDIC assigned its rights and interest in the loan, including its right to administer the loan, to OSM. (Index to Plaintiff OSM's Mot. for Summ. J. ("OSM Index"), Ex. GG at § 2(A) (the "Assignment and Assumption") ("[The FDIC] hereby sells and assigns to [OSM], without representation, warranty or recourse, [the FDIC's] right, title and interest in, to, with respect to, and regarding (a) the Loan Documents . . . and (b) the Participation Agreements.").) The Assignment and Assumption excludes certain rights and provides that OSM "shall not assume or be liable for any claim or liability based on actions or omissions of [the FDIC] (or [BankFirst]), where such actions or omissions occurred prior to" the Assignment's effective date of

June 8, 2010.[1]  (Assignment and Assumption § 3.C.)  The parties stipulated to the substitution of OSM as the plaintiff and for the FDIC to remain as counterclaim defendant in this action.  (Doc. No. 87.)

Defendants Alan H. Ginsburg, Frank Shunock (together "Individual Defendants"), BEH Gaming, Ltd. ("BEH Gaming"), Warm Wind Trust ("WWT"), and Warm Winds Partners, Ltd. ("WWP") are each guarantors of the Loan.  BEH Gaming was formed for the purpose of developing an Indian gaming facility called the Northern Winz Casino (the "Casino Project") for the Chippewa Cree Tribe of the Rocky Boy's Reservation, a federally recognized Indian Tribe, located in Box Elder, Montana.  (CounterCl. ¶ 1; OSM Index, Ex. A (Dep. of Alan H. Ginsburg ("Ginsburg Dep.")) at 35.)  Individual Defendants Ginsburg and Shunock are the principals of and hold ownership interests in BEH Gaming.  (Ginsburg Dep. at 33-35.)  WWP is a limited partnership and a partner of BEH Gaming.  Ginsburg and Shunock hold interests in BEH Gaming through certain entities, including WWP.  WWT is a trust formed under the laws of Canada.  WWT and WWP were created by Shunock for the benefit of his family.  (OSM Index, Ex. B (Dep. of Frank Shunock ("Shunock Dep.")) at 47-48.)

BEH Gaming assisted the Chippewa Cree Community Development Corporation (the "CCCDC") with financing and building the Casino Project.  (OSM Index, Ex. C

---

[1]    The FDIC retained, for example, its rights to indemnification under the Loan Documents and its right to bring claims against specific third parties.  (Ex. GG § 2(A)-(B).)

(Dep. of Gene Harris ("Harris Dep.")) at 55-56.)  In August 2005, BEH Gaming and the

CCCDC entered into a Turn-Key Facility Agreement (the "Development Agreement"),

under which BEH Gaming warranted and represented that it would provide, or arrange for

a third party to provide, financing to the CCCDC for the construction of the Casino

Project.  (OSM Index, Ex. M ("Development Agreement") § 3.3.)[2]  In addition to its

assistance with financing, BEH Gaming agreed to assist the Borrower with the design,

development, and construction of the Casino Project.  In return, BEH Gaming would

receive a percentage of the Casino's gross revenues.  (Harris Dep. at 64-65.)

In late 2005 or early 2006, representatives of BankFirst, John Jagiela and Steve

Erickson, discussed the Casino Project with Ginsburg.[3]  In February 2006, BEH Gaming

corresponded with BankFirst regarding BankFirst's interest in financing the Casino

Project.  (OSM Index, Ex. E (Dep. of John Jagiela ("Jagiela Dep.")) at 57.)  At some

point, Jagiela flew to Florida for a meeting with Ginsburg and Shunock, during which the

three discussed interest rates, the term of the loan, and guaranty agreements.  (Ginsburg

Dep. at 57-59.)  Ginsburg testified during his deposition that he specifically advised

Jagiela that timing was the "key to this whole thing":

---

[2]     CCCDC is a corporation wholly owned by the Chippewa Cree Tribe of the
Rocky Boy's Reservation (the "Tribe").

[3]     The parties give different accounts of the facts underlying this case.  The disputed
facts are recited here, unless otherwise indicated, in the light most favorable to the
Defendants, the non-moving parties.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,
255 (1986).  They are not binding factual determinations.

> We told [Jagiela] in the start that the key to this whole thing with him was timing, that we were somewhat under the gun to get this thing started and I told him we really can't start construction unless we know where the money is coming from because we can't pay for this . . .
>
> . . .
>
> I was just trying to make the point to Jagiela that we really needed a bank loan to be able to start construction, that we were not desirous or have any interest in self-funding this thing.

(*Id.* at 59.) Ginsburg also testified that Jagiela indicated that "the bank has more money to lend." (*Id.* at 74.) In addition, Ginsburg testified that Erickson indicated that the bank had the money to lend and that the bank could close in four to six weeks. (Ginsburg Dep. at 75-76, 78-79.)

On February 2, 2006, Jagiela sent a draft engagement letter to the Tribe, with a copy to the representative of the guarantors, stating that the bank "understands the significance of this Financing to [the Tribe] and as such, will strive to move forward with the Financing in as an expeditious and efficient manner as possible." (Aff. of Jason R. Asmus ("Asmus Aff.") ¶ 18, Ex. 14.) On March 6, 2006, Jagiela prepared a BankFirst Resource Allocation Committee document indicating that credit committee approval would occur on March 24, 2006, release to sales would occur on March 28, 2006, and that the loan would close on May 12, 2006. (Asmus Aff. ¶ 19, Ex. 15.)

On April 2, 2006, BankFirst sent the CCCDC and BEH Gaming another draft "Engagement Letter" that outlined proposed terms and conditions regarding financing the Casino Project. The proposed term sheet provided for a loan of $12.65 million and a

proposed closing date of May 12, 2006. (OSM Index, Ex. O.) Neither BankFirst nor the

CCCDC executed the proposed engagement letter. A subsequent term sheet dated

April 21, 2006 provided for a $12.65 million construction loan to the Tribe with a closing

date of May 31, 3006. (OSM Index, Ex. P.) OSM claims that this Term Sheet was never

executed. Defendants claim that this was a "finalized" term sheet. (Defs.' Combined

Mem. of Law in Opp'n to Mots. for Summ. J. at 9.) Defendants assert that it relied on

promises made by Jagiela that BankFirst would close on its agreement and provide

$12.65 million in financing to the Borrower by May 31, 2006.

BEH Gaming directed that construction begin, and in May 2006, the CCCDC

began construction. (OSM Index, Ex. H (Dep. of Corey Markovich ("Markovich Dep.")

at 23, 36.) BEH Gaming and its principals agreed to fund interim construction costs.

(Asmus Aff., ¶ 31, Ex. 27 at ¶ 6.)

On or about June 2, 2006, counsel for BankFirst sent copies of a due diligence

checklist to counsel for the CCCDC, the Tribe, and BEH. (OSM Index, Ex. Q.) The

checklist identified certain documents and items required by BankFirst before it would

make the construction loan, including a payment and performance bond to be obtained by

the general contractor.

At some point after construction began, OSM claims that Erickson informed BEH

Gaming that the closing of the construction loan would be delayed until June 16, 2006,

but that BankFirst would provide a bridge loan in the amount of $2.35 million by

June 9, 2006. BankFirst did not provide the bridge loan or close the construction loan by

those dates. (Asmus Aff. Ex. 27 ¶ 7.)

On August 1, 2006, the CCCDC and BankFirst entered into a Loan Agreement. (OSM Index, Ex. R.) Per the Loan Agreement, BankFirst agreed to provide the CCCDC with a $2.35 million bridge loan to fund the construction that had already occurred. (*Id.* at § 2.1.) BankFirst also agreed to provide a $12.65 million construction loan upon the completion of certain conditions precedent. (*Id.*) The conditions included (1) providing BankFirst with a payment and performance bond insuring the work of the general contractors and the payment of subcontractors; and (2) obtaining financing for gaming and other equipment. (*Id.*, Ex. R, Art. V; Ex. LL, Arts. 2, 3.)[4]

The Loan Agreement also provided that BankFirst was *not* obligated to fund the Loan until it had "successfully syndicated the construction loan in a manner acceptable to Lender in its sole and absolute discretion." (*Id.*, Ex. R at § 5.2(i).) Immediately below this provision, the Loan Agreement also reads:

> **FAILURE BY THE LENDER TO SUCCESSFULLY SYNDICATE THE CONSTRUCTION LOAN DOES NOT CONSTITUTE A BREACH OR DEFAULT ON THE PART OF THE LENDER HEREUNDER OR UNDER ANY OF THE OTHER LOAN DOCUMENTS. IT IS UNDERSTOOD AND AGREED BY THE BORROWER THAT LENDER IS OBLIGATED ONLY TO MAKE THE INITIAL ADVANCE OR INITIAL ADVANCES UNDER THE BRIDGE LOAN UPON SATISFACTION OF THE CONDITIONS PRECEDENT SET FORTH IN SECTION 5.1 AND THAT LENDER HAS NO COMMITMENT OR OBLIGATION TO FUND ANY**

---

[4] On August 8, 2006, Bank First provided the CCCDC and Guarantors with a letter detailing the conditions precedent. This letter was executed by the CCCDC, BEH Gaming, Ginsburg, and Shunock. (OSM Index, Ex. X.)

**ADVANCES UNDER THE CONSTRUCTION LOAN UNLESS AND UNTIL LENDER HAS SUCCESSFULLY SYNDICATED THE CONSTRUCTION LOAN. THE LENDER MAKES NO REPRESENTATIONS OR WARRANTY CONCERNING ITS ABILITY TO SUCCESSFULLY SYNDICATE THE CONSTRUCTION LOAN OR THE TIME PERIOD THAT MAY BE REQUIRED TO COMPLETE A SYNDICATION.**

(*Id*. at § 5.2.) Ginsburg testified that when he inquired about the syndication provision, he was told that the provision was merely "boilerplate," and that BankFirst would fully fund the loan. (Ginsburg Dep. at 107-11.)

Also on or about August 1, 2006, Ginsburg, Shunock, BEH Gaming, WWT and WWP executed Guaranty Agreements whereby each guaranteed the timely payment in full and performance of all amounts due under the loan documents, plus accrued interest and other fees. (OSM Index, Exs. S-W.)

The Guaranty Agreements contain the following language:

> Guarantor hereby guarantees to the Lender the timely payment in full when due . . . and performance of the Guaranteed Obligations in each case strictly in accordance with their terms. Guarantor hereby further agrees that if the Borrower shall fail to pay in full when due . . . all or any part of the Guaranteed Obligations, Guarantor will immediately pay the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of all or any part of the Guaranteed Obligations, the same will be timely paid in full when due. . . . This Guaranty is absolute, irrevocable and unconditional in nature and is made with respect to any and all Guaranteed Obligations now existing or in the future arising. This Guaranty is a guarantee of due and punctual payment and performance and not of collectability.

(Exs. S-T at § 2.01.)

> During the Term, the Guarantor hereby irrevocably, absolutely and unconditionally guarantees to the Lender the Borrower's timely payment in

full on or before the date when due . . . of each of the following [Guaranteed Obligations.] . . .

(Exs. U-W § 2.)  The Guaranty Agreements of Ginsburg and Shunock further provide that:

Guarantor hereby expressly waives to the fullest extent not prohibited by applicable law any defense now or in the future arising (other than a defense that the Guaranteed Obligations have been indefeasibly paid in full in cash), by reason of:

(i)     the illegality, invalidity or unenforceability of all or any part of the Guaranteed Obligations, any Loan Document or any agreement, security document, guarantee or other instrument relative to all or any part of the Guaranteed Obligations;

. . .

(iii)    any disability or other defense with respect to all or any part of the Guaranteed Obligations of the Borrower, or any other guarantor of all or any part of the Guaranteed Obligations;

. . .

(xiii)   any counterclaim, set-off or other claim which the Borrower or any other guarantor has or alleges to have with respect to all or any part of the Guaranteed Obligations; [or]

. . .

(xxiii) any other circumstance whatsoever, whether similar or dissimilar to any of the foregoing, that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor.

(Exs. S-T at § 2.03(b)(i), (iii), (xiii), (xxiii).)  The Guarantors also waived all claims, setoffs and discharges relating to the obligations arising under the loan documents.  (Exs. S-T § 2.03(d).).

Similarly, the Guaranty Agreements of BEH Gaming, WWP, and WWT provide that:

> The Guarantor waives any and all defenses, claims, setoffs and discharges of the Guarantor, or any other obligor, pertaining to any Guaranteed Obligation, except the defense of discharge by payment in full. Without limiting the generality of the foregoing, the Guarantor will not assert, plead or enforce against the Lender any defense of waiver, release, discharge or disallowance in bankruptcy, statute of limitations, res judicata, statute of frauds, anti-deficiency statute, fraud, incapacity, minority, usury, illegality or unenforceability which may be available to the Guarantor or any other person liable in respect of any Guaranteed Obligation, or any setoff available against the Lender to the Guarantor or any other such person, whether or not on account of a related transaction.

(Ex. U-W § 7.)

Both Ginsburg and Shunock testified that prior to executing the Guaranty Agreements, they asked Jagiela if BankFirst was ready to fund, and they were told yes. (Ginsburg Dep. at 116; Shunock Dep. at 67.) In addition, Defendants assert that in July 2006, Jagiela promised that a bridge loan would be made on August 2, 2006, that the remaining financing would be available before the end of August 2006, and that Defendants signed the guarantees in reliance on these promises. (Asmus Aff., Ex. 27 ¶ 8.) Defendants assert that BankFirst then failed to meet the August 2, 2006 date on which they agreed to fund a bridge loan. (*Id*. at ¶ 9.) In addition, Defendants assert that after the bridge loan was eventually made, BankFirst offered to make a second bridge loan and BankFirst claimed that the remaining financing would occur by the end of September. Defendants further assert that the promised second bridge loan was not funded as promised and that the re-scheduled closing date was not met. Defendants assert

10

that the delayed financing caused them to incur additional construction delays. (*Id.*)

BankFirst provided bridge loans totaling $4.2 million through November 3, 2006. OSM claims that BankFirst was not obligated to do so because certain conditions precedent were not met. OSM asserts that the conditions precedent were ultimately met in mid-November. BankFirst closed on the loan on or about November 15, 2006. (Asmus Aff., Ex. 27, ¶ 9 & Ex. 31.) Defendants assert that more delays were encountered in funding construction draws. (Asmus Aff., Ex. 28 ¶ 5.)

The Casino opened in February 2007. Defendants assert that this opening date was originally scheduled for November 17, 2006 but had to be postponed twice due to financing delays. The Casino failed to generate adequate revenues, and the CCCDC defaulted on the construction loan payments. (Asmus Aff., Ex. 41.) On or around February 21, 2008, BankFirst gave the CCCDC and the Defendants written notice that the CCCDC had breached the Loan Agreement. (OSM Index, Ex. EE; Asmus Aff. Ex. 44.) In and around July 2008, the record shows that the parties exchanged drafts of a proposed forbearance agreement. (Asmus Aff. Ex. 46 -48.) There is no evidence, however, that an agreement was ever executed. Instead, the record shows that Defendants returned an executed copy of the forbearance agreement, which contained changes and modifications. There is no evidence that BankFirst accepted those changes.

On October 9, 2008, BankFirst brought this action against the Defendants as guarantors of the construction financing loan after the borrower defaulted. Defendants filed answers and counterclaims alleging fraud, breach of contract, breach of implied

covenant of good faith and fair dealing, and promissory and equitable estoppel. Defendants seek to extinguish their Guaranty Agreements and to recover damages for BankFirst's alleged misrepresentations.

As explained above, the FDIC was appointed receiver for BankFirst and was substituted as plaintiff and counterclaim defendant in this action. The FDIC then assigned its rights and interests, excluding certain retained rights, to OSM, and OSM was later substituted as the plaintiff in this action. OSM now moves for summary judgment in its favor on the breach of contract claims against the Defendants. The FDIC also moves for summary judgment on Defendants' counterclaims against BankFirst, which are now asserted against the FDIC.

## I.     Summary Judgment

### A.     Legal Standard

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## B. OSM's and the FDIC's Motions

In Counts One through Five of its Amended Complaint, OSM alleges that Defendants are liable under the Guaranty Agreements for the CCCDC's failure to perform under the Loan Agreement and in breach of their obligations thereunder. Defendants each assert counterclaims against BankFirst (now asserted against the FDIC) for breach of contract, breach of covenant of good faith and fair dealing, fraud, and promissory and equitable estoppel. Defendants also assert several affirmative defenses including defenses that OSM's claims are barred by BankFirst's misrepresentations that induced Defendants to sign the Guaranty Agreements.

OSM moves for summary judgment on their affirmative claims and asserts that it is entitled to judgment in the amount of $14,738,359.65. In support, OSM has submitted evidence that as of September 17, 2010, the total amount due and owing under the Loan Agreement is $14,738,359.65. This amount is the sum of the principal loan amount

13

($11,451,268.80), accrued interest ($3,192,118.24), and late fees ($94,972.61). OSM

asserts that interest and fees continue to accrue at a rate $4,201.50 per day and that the

Guarantors agreed to pay costs and expenses, including attorney fees and costs, incurred

by OSM to enforce the Guarantor's obligations under the Guaranty Agreements. (OSM

Index, Exs. S-T § 5.04; Exs. U-W §§ 6, 18.) In addition, the FDIC moves for summary

judgment on Defendants' counterclaims.

Defendants do not dispute that the CCCDC defaulted on the Loan, that the

Guaranty Agreements require Defendants to satisfy the CCCDC's payment obligations,

or that Defendants have not satisfied those obligations. Instead, via their affirmative

defenses and counterclaims, Defendants assert that the Guaranty Agreements are subject

to rescission on the ground that Defendants were fraudulently induced into signing the

Guaranty Agreements. Specifically, Defendants assert that they were induced to sign the

Guaranty Agreements, commence construction, and advance funds for construction by

representations made by BankFirst's employees that BankFirst would actually fund the

loan, rather than act as a broker. Defendants assert that these misrepresentations caused

construction delays and substantial cost overruns, which both contributed to the failure of

the Casino and the subsequent default on the Loan.

Specific to this motion, Defendants assert that neither OSM nor the FDIC can

carry their Rule 56 burden because (1) Defendants have not had a sufficient opportunity

to conduct relevant and necessary discovery; and (2) genuine issues of material fact exist

regarding Defendants' counterclaims and affirmative defenses. With respect to the latter,

Defendants assert that there are genuine issues of material fact with respect to Defendants' defenses to OSM's claims, particularly that the Guaranties are subject to rescission because of fraudulent misrepresentations.

### 1. Rule 56(f)

Defendants assert that they have not had the opportunity to complete discovery and lack information that is necessary for their defense against OSM's claims, their prosecution of counterclaims against the FDIC, and the potential prosecution of counterclaims against OSM.

On June 18, 2009, the parties filed a stipulation to allow OSM to substitute as plaintiff for the FDIC, with the FDIC remaining in the lawsuit as counterclaim defendant. (Doc. No. 87.)  On June 22, 2009, the parties filed a stipulation to amend the pretrial scheduling order.  On July 15, 2009, the Court agreed to extend the deadlines for discovery, dispositive motions, and trial to October 1, 2010, December 1, 2010, and April 1, 2011, respectively.  (Doc. No. 93.)  On July 26, 2010, Defendants served OSM and the FDIC with discovery requests.  OSM and the FDIC served written discovery responses and produced disks on August 23, 2010.  (Asmus Aff. ¶ 9.)  Defendants filed their opposition brief on August 27, 2010, and claim that they had not had time to substantively review the discovery prior to filing their opposition.  Defendants assert that the completion of pending discovery would shed light on several facts and issues, namely, (1) the replacement of BankFirst and the FDIC as lead lender and/or servicer with respect to the Loan; (2) the assignment by the FDIC to OSM of any servicing obligations relating

to the Loan; (3) communications between OSM and the FDIC regarding the Loan, the

Guaranty Agreements, Defendants, and this lawsuit; (5) communications between OSM

and any of the bank participants regarding the Loan, the Guaranty Agreements,

Defendants, and/or this lawsuit; and (6) OSM's business activities and employees.

(Asmus Aff. ¶ 8.)

> Federal Rule of Civil Procedure 56(f) provides:
>
> If a party opposing the motion shows by affidavit that, for specified reasons,
> it cannot present facts essential to justify its opposition, the court may:
> (1) deny the motion; (2) order a continuance to enable affidavits to be
> obtained, depositions to be taken, or other discovery to be undertaken; or
> (3) issue any other just order.

Fed. R. Civ. P. 56(f). "To request discovery under Rule 56(f), a party must file an

affidavit describing:  (1) what facts are sought and how they are to be obtained; (2) how

these facts are reasonably expected to raise a genuine issue of material fact; (3) what

efforts the affiant has made to obtain them; and (4) why the affiant's efforts were

unsuccessful." *Johnson v. United States*, 534 F.3d 958, 965 (8th Cir. 2008).  In

particular, Defendants assert that the discovery is necessary to determine whether OSM

and the FDIC can claim the protections of 12 U.S.C. § 1823(e), and to discover

information that is necessary for their defense against OSM's claims, their prosecution of

counterclaims against the FDIC, and the potential prosecution of counterclaims against

OSM.

> The Court concludes that it has before it the relevant information it needs to

determine the pending motions.  First, as discussed below, the Assignment and

Assumption Agreement between OSM and the FDIC contains the information necessary to determine whether OSM and the FDIC can invoke § 1823(e) to bar Defendants' defenses to OSM's claims under the Guaranties. Defendants have not identified any additional facts that would affect OSM's standing to invoke § 1823(e). Second, Defendants assert that they need additional time to investigate the prosecution of their counterclaims against the FDIC and its potential counterclaims against both OSM and the FDIC. The Court, however, has sufficient evidence before it to rule on the motions as they relate to Defendants' counterclaims. The viability of Defendants' current counterclaims is discussed in detail below. Defendants have not shown any facts to be obtained that would raise a genuine issue of material fact to preclude summary judgment against Defendants on their current counterclaims. Moreover, the potential existence of counterclaims against OSM or the FDIC that have not already been raised does not affect OSM's and the FDIC's entitlement to summary judgment on the claims briefed. Accordingly, Defendants' Rule 56(f) motion is denied.

### 2. Defendants' Fraudulent Inducement Claim

Defendants have asserted affirmative defenses to OSM's claims and counterclaims against BankFirst—now asserted against the FDIC—relating to BankFirst's alleged fraud in the inducement. Both OSM and the FDIC move for summary judgment on Defendants' affirmative defense and counterclaim of fraudulent inducement.

A claim of fraudulent inducement of an agreement requires the Defendants to show the following: (1) a misrepresentation of material fact by BankFirst; (2) that

BankFirst knew the statement was false at the time or made the assertion without regard to its falsity; (3) that BankFirst intended Defendants to act; (4) that the Defendants reasonably relied on the statement; (5) that the Defendants acted to their detriment; and (6) that the Defendants incurred actual damages. *See Cohen v. Appert*, 463 N.W.2d 787, 789 (Minn. Ct. App. 1990).[5] Assuming for the purposes of this motion that BankFirst represented that it would act as the actual lender, OSM and the FDIC each move, respectively, for summary judgment on Defendants' affirmative defense and counterclaim for fraud.

The heart of the Defendants' fraudulent inducement claim is that BankFirst intentionally misled the Defendants into believing that BankFirst would be the actual lender—and not a broker—of the Loan, and that this representation induced Defendants into executing the Guaranty Agreements.[6] OSM, however, asserts that the terms of the

---

[5]     The elements are similar to those of a fraudulent misrepresentation claim, which would require the Defendants to show: (1) a false representation of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made without knowing whether it was true or false; (3) with the intention to induce Defendants to act in reliance thereon; (4) that the representation caused Defendants to act in reliance thereon; and (5) that Defendants suffered pecuniary damages as a result of its reliance. *See Hoyt Props., Inc. v. Prod. Res. Group, L.L.C.,* 736 N.W.2d 313, 318 (Minn. 2007). The Minnesota Supreme Court has applied these elements to a claim for fraudulent inducement. *See Valspar Refinish, Inc. v. Gaylord's, Inc.,* 764 N.W.2d 359, 368 (Minn. 2009)

[6]     Defendants initially asserted that BankFirst failed to deliver on numerous representations that it would close and deliver funding on the construction loan (and later various bridge loans) when promised. Although these assertions are addressed in the factual background of this case, Defendants do not make the argument that they were

(Footnote Continued on Next Page)

Loan Agreement contradict the alleged misrepresentations and bars reasonable reliance as a matter of law.[7]

The Court concludes that both the Loan Agreement and the Guaranty Agreements are unambiguous as a matter of law. While Defendants have submitted evidence that BankFirst represented that it would provide the money for the construction loan, there is no term in either the Loan Agreement or the Guaranty Agreements that indicates that BankFirst was required to act as the actual lender on the Loan. In fact, the language in the Loan Agreement and the Guaranty Agreements explicitly provides otherwise. The Loan Agreement contains specific conditions precedent to BankFirst's obligation to fund and close the Loan, one being that BankFirst "shall have successfully syndicated the Construction Loan in a manner acceptable to Lender in its sole and absolute discretion." (Ex. R §5.2(i).) In addition, the Loan states:

> **THE LENDER HAS NO COMMITMENT OR OBLIGATION TO FUND ANY ADVANCES UNDER THE CONSTRUCTION LOAN UNLESS AND UNTIL THE LENDER HAS SUCCESSFULLY SYNDICATED THE CONSTRUCTION LOAN.**

(Ex. R § 5.2.) Further, both the Loan Agreement and Ginsburg's and Shunock's

---

(Footnote Continued From Previous Page)
fraudulently induced into signing the Guaranty Agreements by BankFirst's representations that the loans would close on a certain date. Accordingly, any such argument has been abandoned.

[7]      OSM argues that this claim should be dismissed on summary judgment because Defendants did not allege this misrepresentation in their answers to the Amended Complaint or in their Counterclaims. Without deciding whether this alleged

(Footnote Continued on Next Page)

Guaranties contain integration clauses that expressly provide that the agreement supersedes any prior agreement, whether written or oral. For example, the Loan Agreement provides:

> This Agreement, together with the other Loan Documents, comprises the entire agreement of the parties on the subject matter hereof and supersedes and replaces all prior agreements, oral and written, on such subject matter.

(Ex. R § 8.24.) Similarly, Ginsburg's and Shunock's Guaranty Agreements contain the following clauses:

> This Guaranty represents the final agreement among Guarantor and the Lender and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of such parties. There are no unwritten oral agreements between or among Guarantor and the Lender.

(Exs. S-T § 5.08.)

Given the unambiguous language of the agreements, and viewing the evidence in the light most favorable to Defendants, the Court concludes that Defendants cannot, as a matter of law, establish that they justifiably relied on any alleged misrepresentation by BankFirst that BankFirst would fund the Loan itself. Here, the alleged misrepresentations by BankFirst directly conflict with the written contractual provisions allowing for syndication and, therefore, reliance on the unwritten representations is unjustifiable. *See Syverson v. Firepond, Inc.*, 383 F.3d 745, 750 (8th Cir. 2004); *Crowell v. Campbell Soup Co.*, 264 F.3d 756, 762-63 (8th Cir. 2001). In short, no reasonable juror could conclude

---

(Footnote Continued From Previous Page)
misrepresentation was properly pleaded, the Court addresses the claim on the merits.

that Defendants reasonably relied on any misrepresentations regarding the funding of the loan that are in direct conflict with the express provisions of the executed Loan Agreement. *Accord Northfield Telecomm, Inc. v. Maplewood Mall Assocs., Ltd*., No. A07-0687, 2008 WL 853537, *9 (Minn. Ct. App. April 1, 2008) (considering a fraudulent inducement claim and affirming district court's conclusion that plaintiff had not established fraudulent inducement as a matter of law where a contract contained a provision that contradicted purported misrepresentation and a merger clause).

Accordingly, the Court grants summary judgment on Defendants' affirmative defenses and counterclaims for fraudulent inducement.[8]

### 3. Section 1823(e)

OSM and the FDIC both assert, respectively, that Defendants' affirmative defenses and counterclaims, insofar as they are based on BankFirst's purported misrepresentations, are barred by 12 U.S.C. §1823(e).

Section 1823(e) provides:

> No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it . . . shall be valid against the [FDIC] unless such agreement-
>
> (A) is in writing,

---

[8] OSM also argues that Defendants waived any right to seek rescission of the Guaranty Agreements because they continued to accept bridge financing after learning of BankFirst's alleged fraud in the inducement. The Court need not reach this argument since the Court has determined that Defendants' claim of fraud in the inducement fails as a matter of law.

(B) was executed by the depository institution and any person claiming an adverse interest thereunder . . . contemporaneously with the acquisition of the asset by the depository institution,

(C) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(D) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C. § 1823(e).  *See also* 12 U.S.C. § 1821(d)(9) ("[A]ny agreement which does not meet the requirements set forth in section 1823(e) of this title shall not form the basis of, or substantially comprise, a claim against the receiver or the [FDIC].").

Section 1823(e) codified the common law doctrine established in *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447 (1942).  *DiVall Insured Income Fund Ltd. P'ship v. Boatmen's First Nat'l Bank of Kan. City*, 69 F.3d 1398, 1401-02 (8th Cir. 1995).  In *D'Oench,* the Supreme Court barred the use of "secret agreements" that are not recorded in a bank's records as defenses against the payment of a promissory note.  69 F.3d at 1400.

The essence of *D'Oench* is that the FDIC is entitled to rely, to the exclusion of any extraneous matters, on the official bank records that set forth the rights and obligations of the bank and those to whom the bank lends money. . . .  The goal is to allow federal and state examiners to rely on a bank's records in evaluating the worth of the bank's assets, to encourage prudent consideration in lending, and to assure proper recordation of banking acts to guard against collusive or erroneous reconstruction of terms.

*Cmty. Bank of the Ozarks v. FDIC*, 984 F.2d 254, 256-57 (8th Cir. 1993). Thus, under the *D'Oench* doctrine, defenses arising from representations not evidenced in the financial institution's official documents, such as fraud in inducement, are barred. *Id*.

Moreover, § 1823(e)'s protections apply to the FDIC's successors-in-interest. *Id*. at 257; *see also FDIC v. Newhart*, 892 F.2d 47, 50 (8th Cir. 1989) ("[T]he FDIC transfers its protected status to subsequent purchasers of notes it holds.").

Here, the Loan Agreement and Guaranty Agreements were acquired by the FDIC and assigned to OSM. Pursuant to the Assignment and Assumption Agreement, the FDIC sold to OSM its right, title, and interest as Lender. Thus, the record reveals that the FDIC transferred to OSM assets within the scope of § 1823(e). Therefore, any alleged agreement that tends to defeat or diminish OSM's or the FDIC's interest in the Loan Agreement must strictly comply with § 1823(e). The alleged misrepresentations on which Defendants rely do not satisfy the requirements of § 1823(e). Accordingly, § 1823(e) bars Defendants' affirmative defenses and counterclaims that are based on allegations of fraudulent inducement.

### 4. Statute of Frauds

OSM and the FDIC also assert that Defendants' affirmative defenses and counterclaims are barred by the Statute of Frauds for Credit Agreements, Minn. Stat. § 513.33. Minnesota Statute § 513.33 bars the enforcement of "credit agreements" that are not in writing. This statute provides in relevant part that, "[a] debtor may not maintain an action on a credit agreement unless the agreement is in writing, expresses

consideration, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor."  Minn. Stat. § 513.33, subd. 2.  Moreover, under the statute, a "creditor" is defined  as "a person who extends credit under a credit agreement with a debtor" and a "credit agreement" means "an agreement to lend or forbear repayment of money, goods, or things in action, to otherwise extend credit, or to make any other financial accommodation."  Minn. Stat. § 513.33, subd. 1.

Defendants assert that Minn. Stat. § 513.33 is inapplicable here because OSM and the FDIC did not extend credit to Defendants and that even if BankFirst could be considered a "creditor" by virtue of its extension of credit to the CCCDC, that "creditor" status was not transferred to OSM or the FDIC.  The Court disagrees.  The record establishes that BankFirst made the Loan and extended credit to the CCCDC.  Therefore, BankFirst was a "creditor" under Minn. Stat. § 513.33.  The Loan Agreement also provides that BankFirst's legal representatives, successors, and assigns are included as parties and that the Loan Agreement shall be binding upon and inure to the benefit of BankFirst's successors and assigns.  (OSM Index, Ex. R § 8.7.)  The FDIC was appointed receiver for BankFirst and succeeded to all of BankFirst's rights, titles, powers, and privileges, and OSM is the current lead lender and servicer of the Loan.  Accordingly, the Court concludes that both OSM and the FDIC are entitled to the same protections under Minn. Stat. § 513.33 as BankFirst.

Second, Defendants assert that BankFirst's alleged misrepresentation—that it would act as the actual lender—does not qualify as "credit agreements" under Minn. Stat.

24

§ 513.33.  Section 513.33 defines a "credit agreement" as "an agreement to lend or forbear repayment of money, goods, or things in action, to otherwise extend credit, or to make any other financial accommodation."  Minn. Stat. § 513.33, subd. 1.  Using the statutory definition, an alleged agreement to act as the actual lender is a "credit agreement" under the statute.  Accordingly, the alleged misrepresentation by BankFirst is required to be in writing to create a cause of action.

Third, Defendants argue that the doctrine of promissory/equitable estoppel is applied at the discretion of the Court and that the alleged misrepresentations can be taken out of the statute of frauds.  This argument fails because Defendants have not stated viable estoppel claims.  As discussed below, Defendants waived all claims other than fraudulent inducement, and even if Defendants' estoppel claims were not waived, they would fail on the merits—like their fraud claims—for lack of justifiable reliance.

For these reasons, the Court concludes that the alleged misrepresentations on which Defendants rely are required to be in writing and all defenses and counterclaims that are based upon an alleged oral credit agreement are dismissed.

### 5. Remaining Counterclaims and Affirmative Defenses

Defendants assert additional counterclaims and affirmative defenses.  OSM and the FDIC assert that the Defendants waived all of their affirmative defenses in their Guaranty Agreements.

Ginsburg's and Shunock's Guaranty Agreements each state that they "expressly waive[] to the fullest extent not prohibited by applicable law any defense now or in the

future arising . . . by reason of" illegality, invalidity or unenforceability of the Guaranteed Obligations, "any disability or other defense with respect to all or any part of the Guaranteed Obligations of the Borrower, or any other guarantor of all or any part of the Guaranteed Obligations," any counterclaim, set-off or other claim which the CCCDC or any of the guarantors has with respect to all or any part of the Guaranteed Obligations, or "any other circumstance whatsoever . . . that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor." (OSM Index, Exs. S-T at § 2.03(b)(i), (iii), (xiii), (xxiii).)

Similarly, the Guaranty Agreements of BEH Gaming, WWP, and WWT provide that: "The Guarantor waives any and all defenses, claims, setoffs and discharged of the Guarantor, or any other obligor, pertaining to any Guaranteed Obligation, except the defense of discharge by payment in full." (OSM Index, Ex. U-W § 7.)

Defendants assert that OSM and the FDIC cannot rely on these waiver provisions because a waiver is ineffective in cases involving fraudulent inducement. *See Nw. Bank & Trust Co. v. First Ill. Nat'l Bank*, 354 F.3d 721, 726 (8th Cir. 2003) (applying Iowa law). The Court assumes without deciding that OSM and the FDIC cannot rely on the Guarantors' waivers to guard against allegations of fraud or misrepresentation.[9] However, Defendants have not argued that they did not waive other asserted defenses.

---

[9]     For the reasons discussed above, Defendant's fraudulent inducement claims fail on the merits.

The Court concludes that Defendants' defenses and claims, other than those based on claims of fraudulent inducement, have been waived.

Even if Defendants' counterclaims were not waived, however, they fail as a matter of law. First, with respect to their breach of contract claim, Defendants assert that BankFirst breached a forbearance agreement that was reached in June 2008. Defendants assert that the parties agreed to the terms of the forbearance agreement and, in reliance on that agreement, guarantors made interest payments and contributed additional capital to the CCCDC to sustain Casino operations.

The Court concludes that Defendants' breach of contract claim fails as a matter of law. To establish a claim for breach of contract, Defendant must establish that a contract was formed. Defendants have failed to put forth evidence that a valid forbearance agreement was formed in June 2008. The record contains evidence that the parties exchanged drafts of a proposed forbearance agreement. There is no evidence, however, that any of those drafts were executed by all parties without modifications. Accordingly, there is no evidence that an agreement was ever reached.

Second, Defendants cannot, as a matter of law, establish a claim for breach of covenant of good faith and fair dealing. Defendants assert that BankFirst unjustifiably hindered Defendants' performance under the Guaranty Agreements by failing to act as the actual lender and failing to fund the construction loan and bridge loan when it told Defendants it would do so. In essence, Defendants assert that without BankFirst's misrepresentations, no performance by the Guarantors would be due.

"Under Minnesota law, every contract includes an implied covenant of good faith and fair dealing requiring that one party not 'unjustifiably hinder' the other party's performance of the contract." *In re Hennepin County 1986 Recycling Bond Litigation,* 540 N.W.2d 494, 502 (Minn. 1995). Minnesota law, however, "does not favor claims based on the breach of an implied covenant of good faith and fair dealing." *Sports and Travel Marketing, Inc. v. Chicago Cutlery Co.,* 811 F. Supp. 1372, 1383 (D. Minn. 1993). The implied covenant does not extend to actions beyond the scope of the underlying contract. *In re Hennepin County* at 503.

Here, the express terms of the Guaranty Agreements provide that the Defendants guaranteed the timely payment of the Guaranteed Obligations under the Loan. Moreover, as explained above, the Loan Agreement also explicitly provides that BankFirst had no obligation to be the actual lender of the Loan. Thus, there is no evidence in the record that could lead a reasonable juror to conclude that BankFirst did anything to unjustifiably hinder Defendants' performance of its obligations under the Guaranty Agreements by syndicating the loan.

Defendants also assert that BankFirst breached the covenant of good faith and fair dealing by missing certain dates upon which it represented it would provide construction and/or bridge loans. While not entirely clear in its briefs, it appears that this particular claim is based on allegations that BankFirst made certain funding promises prior to signing the Loan Agreement that were not met and that BankFirst made additional oral funding promises after signing the Loan Agreement that were not met. These allegations,

however, do not raise a genuine issue of material fact. There is no evidence in the record that BankFirst unjustifiably hindered Defendants' performance of their absolute and unconditional guaranty to timely pay in full, when due, the obligation of the CCCDC under the Loan. Defendants signed the Guaranties in August 2006. Therefore, any reliance by Defendants on alleged oral promises regarding funding dates that passed prior to the signing of the Guaranty is misplaced. In addition, the evidence in the record indicates that BankFirst's obligation to provide funding to the CCCDC was tied to certain conditions precedent and that any insistence on the part of BankFirst that those conditions be met does not constitute a breach of the covenant of good faith and fair dealing. For these reasons, the Court concludes that Defendants' counterclaim for breach of implied covenant of good faith and fair dealing fails as a matter of law.

Finally, for the reasons discussed above, Defendants' counterclaims for fraud and estoppel fail as a matter of law because Defendants cannot, as a matter of law, establish the element of justifiable reliance.

## II. Additional Issues

At the hearing on this matter, Defendants raised two additional issues, for which the Court permitted additional briefing by the parties.

First, Defendants assert that they are not liable under the respective Guaranty Agreements because the CCCDC has recently asserted that the Loan Agreement is void for lack of National Indian Gaming Commission ("NIGC") approval. In particular, on September 17, 2010, the CCCDC provided written notice that the Loan Agreement and

related Depository Agreement constituted a "management agreement" under NIGC

regulations, that because the Loan Agreement and Depository Agreement had not been

approved, in advance, by the NIGC, that the agreements are void, and that the CCCDC

"will no longer acknowledge any obligation under the purported agreements." (Asmus

Aff., Ex. 52.) Defendants assert that because the Loan Agreement and Depository

Agreement have been declared void for lack of NIGC approval, there are no underlying

"Guaranteed Obligations" for which Defendants are responsible and that Defendants have

no liability under their respective Guaranty Agreements as a matter of law.

OSM responded to the Defendants' new argument and asserts that Defendants

bargained away any defense based on "illegality, invalidity or unenforceability" of the

Guaranteed Obligations or Loan Agreement, that the Loan Agreement is not a

management contract and does not require NIGC approval, and that Defendants failed to

plead this affirmative defense at the outset of this litigation and that they should not be

allowed to invoke a new, unpleaded defense so late in the litigation.

The Court agrees with OSM. First, Defendants expressly waived any defense

based on the "illegality, invalidity or unenforceability" of the Guaranteed Obligations or

Loan. (OSM Index Exs. S-T, § 2.03(b)(i); U-W § 7.) Thus, the Guaranties are

enforceable even if the underlying obligations or agreements are invalid. *See, e.g., URSA

Minor Ltd. V. AON Fin. Prods., Inc.*, No. 00CIV-2474, 2000 WL 1010278, at *7

(S.D.N.Y. July 21, 2000); *Minasian v. Standard Chartered Bank, PLC*, No. 93C 6131,

1995 WL 530648, at *13 (N.D. Ill. Sept. 8, 1995). Second, Defendants have not

demonstrated that the Loan Agreement and Depository Agreement constitute management contracts over tribal affairs and, thus, that NIGC approval under 25 U.S.C. § 2711 is required. Third, Defendants did not plead as an affirmative defense that the Loan Agreement and Depository Agreement are void and therefore that the Guaranty Agreements are unenforceable. Defendants cannot seek to avoid summary judgment by raising a belated, unpleaded defense this late in the litigation.

Defendants also assert that they discovered that the FDIC has divested itself of all right, title, and interest in the Loan and that all of these rights have been acquired by OSM. As discussed in the background section above, OSM is the current lead lender and servicer on the Loan. The original lead lender was BankFirst, who went into FDIC receivership in July 2009. The FDIC succeeded to all of the right, title, and interest in the assets of BankFirst and was substituted as plaintiff and codefendant in this action. In February 2010, OSM replaced the FDIC as lender and servicer of the loan and the FDIC assigned its rights and interest in the loan, including its right to administer the loan, to OSM. (OSM Index, Ex. GG at § 2(A).) The Assignment to the FDIC, however, excluded certain rights and OSM assumed no liability for any counterclaim in this action or for any claim against or liability based on actions of the FDIC or BankFirst which occurred prior to the Assignment's effective date, June 8, 2010.[10] (Assignment § 3.C.) The parties

---

[10]     The FDIC retained its interest as a loan participant, its rights to indemnification under the loan documents, and its right to bring claims against specific third parties. (Ex. GG § 2(A)-(B).)

stipulated to the substitution of OSM as the plaintiff and for the FDIC to remain as counterclaim defendant.  (Doc. No. 87.)

Defendants now assert that OSM now holds all right, title, and interest that was previously held by BankFirst and that OSM is the "real party in interest" with respect to the claims to enforce the Guaranty Agreements *and* with respect to Defendants' counterclaims.

Here, there is no dispute that under the Assignment and Assumption Agreement between OSM and the FDIC that OSM assumed no liability for any conduct by BankFirst or the FDIC prior to June 8, 2010.  (Ex. GG § 3(C).)  Defendants do not cite to any authority to support its assertion that OSM should be responsible for liability that the FDIC specifically retained.  Instead, case law provides that an entity that purchases an asset of a failed institution from the FDIC is not liable for the conduct of the receiver or the failed institution unless that liability is transferred and assumed by the purchaser.  *See, e.g., Yeomalakis v. FDIC*, 562 F.3d 56, 60 (1st Cir. 2009); *Kennedy v. Mainland Sav. Ass'n*, 41 F.3d 986, 990-91 (5th Cir. 1994).  OSM did not expressly assume liability for BankFirst's conduct under the Assignment and Assumption Agreement.  In fact, the Assignment and Assumption Agreement provides that OSM did *not* assume liability for conduct by BankFirst or the FDIC prior to June 8, 2010.  Accordingly, the FDIC is the real party in interest with respect to Defendants' counterclaims.

## CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons set forth

above, **IT IS ORDERED** that:

1.      OSM's Motion for Summary Judgment (Doc. No. [99]) is **GRANTED**.

      a.      Defendants are liable to OSM in in the amount of

$14,738,359.65, plus per diem interest and fees.

      b.      OSM shall submit affidavit support for its claim of attorney

fees and costs.

2.      The FDIC's Motion for Summary Judgment on Counterclaims (Doc.

No. [95]) is **GRANTED**.

      a.      Defendants' Counterclaims against the FDIC are

**DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  December 7, 2010          s/Donovan W. Frank
                                 DONOVAN W. FRANK
                                 United States District Judge